ALAN NESBIT, ESQ.
Attorney-at-Law, SBN 310466
8383 Wilshire Boulevard Ste 800
Beverly Hills, California 90211
Tel:  (323) 456-8605
Fax:  (323) 456-8601

Attorney for Plaintiffs,
ADVANCED ORTHOPEDIC CENTER INC., JEFFREY M SMITH MD INC., JSE
EMERGENCY MEDICAL GROUP, INC.

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## FIRST STREET COURTHOUSE

| | |
|---|---|
| ADVANCED ORTHOPEDIC CENTER INC., JEFFREY M SMITH MD INC., JSE EMERGENCY MEDICAL GROUP INC., <br><br> Plaintiffs, <br><br> v. <br><br> ANTHEM BLUE CROSS LIFE AND HEALTH INSURANCE CO. AND DOES 1 -40, <br><br> Defendants. | Case No.: 2:18-cv-03243-SJO-MRW <br><br> **PLAINTIFFS' THIRD AMENDED COMPLAINT FOR:** <br><br> BREACH OF EMPLOYEE WELFARE BENEFIT PLAN (RECOVERY OF PLAN BENEFITS UNDER ERISA) 29 U.S.C. § 1132(a)(1)(b) <br><br> **JURY TRIAL REQUESTED** <br><br> Damages: UNLIMITED: Over $25,000 |

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

Plaintiff ADVANCED ORTHOPEDIC CENTER, INC. (hereafter referred to as "AOC" or "Physicians") JEFFREY M SMITH MD INC., ("JS" or "Physicians") and JSE EMRGENCY MEDICAL GROUP INC ("JSE" or "Physicians") complain and allege:

## GENERAL ALLEGATIONS

1.   This Complaint states a controversy over which this Court has subject matter jurisdiction. This Court's jurisdiction is invoked pursuant to 29 U.S.C. § 1337 and 29 U.S.C. § 1132(e).  Plaintiff's claims arise under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001, *et seq* and under the Mental Health Parity and Addiction Equity Act of 2008 (MHPAEA), 26 U.S.C. § 9812 et seq. AOC, JS and JSE are and at all relevant times were a corporation organized and existing under the laws of the State of California and was and is a resident of the County of Los Angeles.

2.   AOC, JS and JSE are and at all relevant times were in the business of providing patients with medical services, operations, surgeries, medications, devices, and any other services related to healthcare. As such Physicians have been assigned these accounts receivable and related claims and their Insurance rights and benefits directly by the Patients.

3.   Physicians provided medical care, services, treatment, and/or procedures and services to members, subscribers and insureds ("Patients") of ANTHEM BLUE CROSS LIFE AND HEALTH INSURANCE CO. ("ANTHEM") AND DOES 1 - 40, California Corporations, (hereafter referred to as ("DEFENDANT" or "DEFENDANTS").  Physicians became entitled to reimbursement, payment and/or indemnification from DEFENDANTS for those services and supplies rendered. Patients have assigned their rights under their plans including their right to payment and to collect their fees from DEFENDANTS to Physicians.

4.   DEFENDANT is a California corporation licensed to do business in and was doing business in the State of California, as an insurer. Physicians are informed

and believe that DEFENDANT is licensed by the Department of Insurance to transact the business of insurance in the State of California. DEFENDANT is, in fact, transacting the business of insurance in the State of California and is thereby subject to the laws and regulations of the State of California.

5. The true names and capacities, whether individual, corporate, associate, or otherwise, of DEFENDANTS are unknown to PHYSICIANS, who therefore sues said DEFENDANTS by such fictitious names. PHYSICIANS are informed and believe and thereon alleges that each of the DEFENDANTS designated herein as a DOE is legally responsible in some manner or to some extent for the events and happenings referred to herein and legally caused injury and damages proximately thereby to PHYSICIANS. PHYSICIANS will seek leave of this Court to amend this Complaint to insert their true names and capacities in place and instead of the fictitious names when they become known to it.

6. At all times herein mentioned, unless otherwise indicated, DEFENDANTS were the agents and/or employees of each of the remaining DEFENDANTS and were at all times acting within the purpose and scope of said agency and employment, and each DEFENDANT has ratified and approved the acts of his agent. At all times herein mentioned, DEFENDANTS had actual or ostensible authority to act on each other's behalf in certifying or authorizing the provision of medical services; processing and administering the claims and appeals; pricing the claims; approving or denying the claims; directing each other as to whether to pay and/or how to pay claims; issuing remittance advices and explanations of benefits statements; and, making payments to PHYSICIANS and its patients.

7. Each of the Patients had express coverage for emergent or post stabilization services as a delineated benefit of their ERISA plans, summary plan descriptions, and policies which were underwritten and/or administered by DEFENDANTS. Each of the Patients was a plan participant and/or beneficiary of an Employee Welfare Benefit Plan ERISA plan, as those terms are defined by 29 U.S.C.§1002.  Each of the Patients

was entitled to be reimbursed for the cost of such treatments as a benefit of the subject DEFENDANTS Plans, policies and insurance agreements governing the relationship between each Patient and DEFENDANT.  Each of the subject DEFENDANT Plans provide coverage for both in and out-of-network health providers, and include coverage for facility charges, Doctors, and the charges for supplies and equipment, physician services, blood testing and other incidental services.  The subject Patients had PPO or POS benefits that allowed them to seek medically necessary benefits, whether in-network or not and were entitled to reimbursement for their claims because Physicians were an out-of-network provider for DEFENDANTS.  The subject Patients' claims should not have been denied or underpaid coverage, as DEFENDANTS plans provide coverage for the very services performed by Physicians.

8.     Each of the Patients whose claims are at issue in this lawsuit had a need for Emergency or Post stabilization treatment.  All of these Patients chose Preferred Provider Organization ("PPO") insurance, rather than HMO insurance, through their employers so that they could receive their medical services in a timely and professional manner from the physicians and other medical providers of their choice, regardless of whether those physicians are in-network or out-of-network. DEFENDANTS, who administer and/or underwrite the PPO insurance for the Patient's employers, advertise, publicize and represent on their websites, in their literature and in commercials that the benefits of their PPO policies include the freedom to choose any doctor for any and all health care needs.

9.     Physicians or the Hospitals where the Patients were being treated, requested that DEFENDANTS authorize the Patients to undergo treatment by Physicians for emergent or post stabilization services.  DEFENDANTS provided authorization to Physicians to admit the Patients, to provide the Patients with services, supplies and to render treatments to the Patients.  DEFENDANTS verified that each of the Patients was covered under a DEFENDANT Plan and that each of the Patients had coverage

for treatments, hospitalization and residential treatment.   DEFENDANT also expressly and/or impliedly represented, promised, agreed and covenanted that it would pay for the treatments, medical and health services to be rendered by Physicians to the Patients.

10.   No provisions in those subject benefit plans, whether in their Summary Plan Descriptions (SPDs) and/or Evidence of Coverage documents (EOCs), justified the failure of DEFENDANTS to pay fees for services charged by health care providers, such as those managed and operated by Physicians, and to instead either pay nothing or a lower amount. It was arbitrary, capricious and improper for DEFENDANTS to do so. In fact, during the insurance verification process for all of the Patients in this case, DEFENDANTS represented to Physicians that it would pay Physician's fees. Physicians sought information during this process about potential limitations on the reimbursement of Physician's fees each time prior to providing services, and specifically inquired each time prior to providing services as to how DEFENDANT's fee provisions would apply to each Patient. Alternatively, Defendants withheld information in response to such requests, and therefore misled plaintiffs into believing that services rendered by Physicians would be paid.

11.   Likewise, no provisions anywhere in the subject Plans justified the failure to issue a final decision or denial on any of the Patient's claims.  No provisions anywhere in the subject Plans justified the failure and refusal of DEFENDANTS to issue an Explanation of Benefits Statement, delineating and explaining the justification or rationale for refusing to pay, cover and reimburse the Patient's claims or to adjust those claims.  These failures and refusals by DEFENDANTS were therefore arbitrary, capricious, and a breach of DEFENDANT's fiduciary duties to plan participants. These failures and refusals were also violative of regulations promulgated under ERISA by the Department of Labor, which require that claims be adjudicated by the claims administrator (e.g., DEFENDANTS) within 45 days after

receipt of the claim and were also violative of the very Plans and Summary Plan Documents issued and adopted by DEFENDANTS.

12. For each Plan involved in this case, Physicians are informed and believe and thereon allege that the terms of the Plan: (1) provide coverage for each of the services, supplies and treatments rendered by Physicians to each Patient and for which reimbursement, payment and coverage is sought; and (2) dictate that these covered services be paid according to a specific reimbursement rate or according to other formulae or allowable rates specified in the subject Plans. Defendants have failed and refused to reimburse Physicians for the covered services provided by Physicians to the patients, according to the reimbursement rates expressly and specifically provided in the plans and have thereby breached the terms of the subject Plans.

13. Each of the Patients have assigned all of their rights and remedies to payment and to assert their ERISA remedies under the subject Plans to PHYSICIANS. Each of the Patients have assigned all of their legal and equitable rights and remedies to recover the benefits owed to them by DEFENDANTS to PHYSICIANS, by and through an irrevocable assignment of all of their rights, title, and interest in and to their Claims against DEFENDANTS. These assignments conferred upon PHYSICIANS the right to stand in the shoes of the Patients and to assert all of the rights and remedies held by the Patients as to DEFENDANTS and/or as to the Plans administered by DEFENDANTS, including, but not limited to, all rights, powers and equitable remedies of the Patients; the right of PHYSICIANS to substitute in as a party or plaintiff in any past, present, or future litigation regarding the Patient's claims against DEFENDANTS; the right to the proceeds of all legal fees and costs, if specifically awarded; and any interest, if specifically awarded; and, the right to make and effect collections, including the commencement of legal proceedings on behalf of the Patients.

14. In compliance with the terms each of the subject Plans, Physicians and/or its Patients have exhausted any and all claims review, grievance, administrative

appeals, and appeals requirements by submitting letters, appeals, grievances, requests for reconsideration and requests for payment to DEFENDANTS.

15.   Alternatively, all review, appeal, administrative grievances, or complaint procedures are excused by law, are violative of Physicians due process rights, are or would be futile, or are otherwise unlawful, null, void, and unenforceable. DEFENDANTS's pattern of behavior and their refusal to reimburse Physicians render all potential administrative remedies futile. As a result of DEFENDANTS's acts and/or omissions, and its violations of law, DEFENDANTS are estopped from asserting that Physicians have failed to exhaust its administrative remedies under ERISA.  Alternatively, by its failure and refusal to establish, maintain and follow a reasonable claim procedure process, Physicians and/or their Patients have exhausted the administrative remedies available under the subject Plans and are entitled to pursue this action, inasmuch as DEFENDANTS and DOES 1 through 20, inclusive, have failed to provide a reasonable claims procedure that would yield a decision on the merits of the claim, in violation of 29 C.F.R. § 2560.503-1(l).

## **FACTS**

16.   This complaint arises out of the failure of DEFENDANTS to pay PHYSICIANS for services rendered to several of PHYSICIANS's Patients, who were, at all relevant times, enrollees, subscribers, members or insureds of DEFENDANTS. Alternatively, DEFENDANTS has severely underpaid the claims of several of PHYSICIANS's Patients. In communications from DEFENDANTS to PHYSICIANS regarding each of these Patients, DEFENDANTS has acknowledged and confirmed that each and every one of the Patient's claims is subject to and governed by ERISA, without exception.  In order to protect the Patients' identities and rights of privacy, the Patients were identified in a separate schedule sent to the DEFENDANTS. The unpaid amounts owed to PHYSICIANS by DEFENDANTS for each of the Patients is

1  identified in that spreadsheet already provided to the DEFENDANTS Representatives
2  in order to Protect the Patients anonymity under the HIPPA Regulations.

3      17.   Each of the Patients received treatments, professional services, intensive
4  outpatient treatments, pharmaceuticals, laboratory services and other incidental
5  services at PHYSICIANS's facilities or the facilities where they worked.   Payments
6  are now due and owing by DEFENDANTS to PHYSICIANS for the care, treatment
7  and procedures provided to these Patients of PHYSICIANS, all of whom were
8  insureds, members, policyholders, certificate-holders or were otherwise covered for
9  health, hospitalization, pharmaceutical expenses, diagnostics, mental health, facility
10 charges and major medical insurance through policies or certificates of insurance
11 issued, underwritten and/or administered by DEFENDANTS.

12     18.   PHYSICIANS are informed and believe that each of the Patients for
13 whom claims are at issue was an insured of DEFENDANTS either as a subscriber to
14 coverage or a dependent of a subscriber to coverage under a policy or certificate of
15 insurance issued, administered and/or underwritten by DEFENDANTS.
16 PHYSICIANS are informed and believe that each of the Patients for whom claims are
17 at issue was covered by a valid insurance agreement with DEFENDANTS for the
18 specific purpose of ensuring that the Patients would have access to medically
19 necessary treatments, care, procedures and surgeries by out-of-network medical
20 practitioners like PHYSICIANS and ensuring that DEFENDANTS would pay for the
21 health care expenses incurred by the Patients for services rendered by PHYSICIANS.
22 Each of the Patients also had express coverage and benefits for health care services
23 under his/her applicable plan through DEFENDANTS.

24     19.   Alternatively, PHYSICIANS are informed and believe that some of the
25 Patients for whom claims are at issue were covered by self-funded Plans which were
26 administered by DEFENDANTS.  Those self-funded Plans provided coverage to the
27 Patients either as a subscriber to coverage or as a dependent of a subscriber to coverage
28 under a certificate of coverage administered by DEFENDANTS.  For each of these

1    self-funded plans, PHYSICIANS are informed and believe and thereon alleges that
2    DEFENDANTS were a claim fiduciary, Plan fiduciary and administrator charged with
3    making claim determinations on behalf of the Plan and was subject to ERISA and the
4    regulations promulgated by the Department of Labor.

5          20.    PHYSICIANS are informed and believe that each of the Patients for
6    whom claims are at issue was covered by a valid employee benefit Plan, providing
7    coverage for medical health expenses, for the specific purpose of ensuring that the
8    Patients would have access to medically necessary treatments, care and procedures by
9    out-of-network medical practitioners like PHYSICIANS and ensuring that
10   DEFENDANTS would pay for the health care expenses incurred by the Patients for
11   services rendered by PHYSICIANS.

12         21.    At all relevant times, each of the Patients received medical services,
13   procedures, or other healthcare services from physicians or personnel associated with
14   PHYSICIANS at facilities owned and operated by PHYSICIANS or where they
15   worked.  PHYSICIANS and their employees who rendered treatments or performed
16   procedures upon the Patients were "out-of-network providers" or "non-participating
17   providers" who had no preferred provider contracts or other written contracts with
18   DEFENDANTS at the time that the treatments or procedures were performed.
19   PHYSICIANS had no written contracts with DEFENDANTS by which the amount
20   that it would be paid was pre-established, defined or identified at the time that the
21   services or procedures were performed.

22         22.    At all relevant times, each of the Patients received medical services,
23   procedures, or other healthcare services from physicians or personnel associated with
24   PHYSICIANS at facilities owned and operated by PHYSICIANS or where they
25   worked.  Upon the rendition of services to each of the Patients, each of the Patients
26   became legally indebted, responsible and liable to PHYSICIANS for the full cost of
27   and for payment of those services.  Prior to the rendition of services by PHYSICIANS,
28   PHYSICIANS sought and obtained where possible a guarantee from the Patients that

they would be legally responsible, liable and indebted for the full cost of and for payment of those services to be rendered by PHYSICIANS.  However, PHYSICIANS agreed and advised the Patients that it would defer seeking, collecting and recovering any balances owed by the Patients until after PHYSICIANS had first billed and recovered payments from the Patients' health coverage Plans and after the Patients' co-insurance responsibility or out-of-pocket responsibility had been determined and calculated by DEFENDANTS. As a result of the non-payment of benefits by DEFENDANTS and DOES 1 through 20, inclusive, each of the Patients remains liable, indebted and legally responsible for the services rendered by PHYSICIANS to the Patients.  At no times have PHYSICIANS ever waived, excused or otherwise declined to enforce it rights against the Patients to recover payment from those Patients, nor have PHYSICIANS ever communicated any waivers of the Patients' legal responsibility, liability or indebtedness for the cost of services rendered to the Patients.  Similarly, PHYSICIANS have never communicated or represented that it would accept any discounted payment or remuneration from Patients for the cost of their medical treatments.

23.    PHYSICIANS and its employees who rendered treatments or performed procedures upon the Patients were "out-of-network providers" or "non-participating providers" who had no preferred provider contracts or other written contracts with DEFENDANTS at the time that the treatments or procedures were performed. PHYSICIANS had no written contracts with DEFENDANTS by which the amount that it would be paid was pre-established, defined or identified at any time prior to the date that the services or procedures were performed.  As such, DEFENDANTS were required to pay PHYSICIANS in an amount and at rates which were set, calculated and determined solely by DEFENDANTS, in accordance with the terms of the subject and applicable Plans.  Typically, the rates paid to out-of-network providers was a percentage of their billed charges or a rate which was comparable to the rate paid to other similar medical providers in the same geographical area, as determined by

1    DEFENDANTS. Because each of the Patients' health benefit Plans was different and
2    used different methodologies, rates and rubrics to calculate the amount owed by
3    DEFENDANTS, neither the Patients nor PHYSICIANS was aware of the actual or
4    exact amount that would be paid by DEFENDANTS in advance of DEFENDANTS's
5    adjustment and examination of the claims and calculation of benefits.  Typically the
6    amounts payable by DEFENDANTS and the patient's responsibility amounts were
7    communicated by and through the issuance of Explanation of Benefit Statements
8    and/or Explanation of Payment Statements by DEFENDANTS, only after the claims
9    had been adjusted and processed by DEFENDANTS.

10         24.    At all relevant times, therefore, DEFENDANTS and DOES 1 through
11   20, inclusive, were aware and knew that until they processed and issued Explanation
12   of Benefit Statements or Explanation of Payment Statements to the members, Patients
13   and PHYSICIANS, neither PHYSICIANS nor the Patients could determine the
14   allowable amount due or any balance due from the Patients.  As such, it was
15   impossible for PHYSICIANS to collect coinsurance amounts or the Patients' out-of-
16   pocket costs up front in advance of the rendition of services.

17         25.    Each of the Patients signed admissions agreements in which the Patients
18   agreed to be obligated, legally responsible and liable for the full amount of the charges
19   incurred for services rendered at PHYSICIANS.

20         26.    Each of the Patients presented his or her insurance card to PHYSICIANS
21   or facility where they worked, which card identified the Patient as an insured,
22   subscriber and/or member of DEFENDANTS.  These identification cards, which were
23   issued by DEFENDANTS, did not identify whether the coverage was underwritten by
24   DEFENDANTS as an insurer or whether DEFENDANTS was acting as a third party
25   administrator on behalf of a self-funded Plan.  Prior to the rendition of those
26   professional services, treatments, admissions and the provision of care, PHYSICIANS
27   or the facilities where they worked contacted DEFENDANTS with regard to each of
28   the Patients, at the telephone numbers identified on those same cards.  During each

1    one of those phone conversations, PHYSICIANS identified the type of treatment that

2    would be provided to the particular Patient to DEFENDANTS and verified that each

3    of the Patients was covered for such professional services and treatments, using the

4    names and identification numbers listed on the insurance cards of the Patients.  During

5    each one of those phone conversations, DEFENDANTS affirmatively confirmed,

6    represented, and verified that each of the Patients whose claims are involved in this

7    action was an insured of or member of DEFENDANTS; that each of the Patients

8    whose claims are involved in this action had coverage relevant benefits, through their

9    policies or plans; that each of the policies, plans and insurance contracts covering each

10   of the Patients provided coverage for such benefits and would pay for the services

11   sought to be rendered by PHYSICIANS; that there were no exclusions, conditions or

12   limitations which would result in claims submitted on behalf of each Patient being

13   denied, rejected, refused, or unpaid.

14       27.    At all relevant times prior to the provision and rendition of services to

15   each of the Patients, PHYSICIANS or the facilities where they worked contacted

16   DEFENDANTS by phone to obtain prior authorization, pre-certification and consent

17   from DEFENDANTS to render treatment, admit the Patients to its facilities and to

18   provide necessary treatments upon each Patient.  At all relevant times prior to the

19   provision and rendition of services to each of the Patients, PHYSICIANS or the

20   facilities where they worked informed DEFENDANTS of its intent to render services

21   to the Patients and offered that it would provide certain specified services, procedures,

22   treatments and supplies to the Patients in consideration of the payment for those

23   services, procedures, treatments and supplies by DEFENDANTS.  DEFENDANTS

24   accepted that offer and agreed to pay, reimburse, compensate, remunerate, and

25   indemnify PHYSICIANS directly for the specified services, treatments and supplies

26   to be provided and rendered to each of the Patients. As a result of DEFENDANTS's

27   offer to pay for the services to be rendered by PHYSICIANS, PHYSICIANS was

28   induced to and did provide and render professional services and treatments to the

1   Patients at great costs to itself, fully expecting that it would be paid for its services,
2   after submission of its claims to DEFENDANTS.  This expectation was further
3   buttressed by the longstanding interactions, and business practices and customs that
4   had been established between PHYSICIANS and DEFENDANTS over numerous
5   years, which had resulted in DEFENDANTS's processing and payments of hundreds
6   of prior claims on behalf of patients who had received care and treatment at
7   PHYSICIANS.

8        28.    During each of these phone conversations, DEFENDANTS advised and
9   represented that it would adjust all claims submitted by PHYSICIANS and would pay
10  those claims according to its allowed rate, specified in the subject Plan for each patient
11  However, DEFENDANTS never advised PHYSICIANS whether a Patient's claim
12  was insured or underwritten by DEFENDANTS or whether DEFENDANTS was
13  acting in the capacity of an administrator only in adjusting that claim on behalf of a
14  self-funded plan.  To date, throughout the course of all of the interactions between
15  DEFENDANTS and PHYSICIANS relating to the subject claims, DEFENDANTS
16  has never identified whether or which of the subject claims is insured, underwritten or
17  only administered by DEFENDANTS.  DEFENDANTS has never indicated the name
18  of any self-funded Plans or identified those Plans as responsible for payment of the
19  claims for any Patient.  For each of the subject claims, DEFENDANTS identified that
20  it was in fact the claims administrator and that it was acting as a fiduciary for the
21  subject Plan.  Plaintiff may seek leave to identify any and all self-funded Plans and to
22  join those Plans when and if DEFENDANTS identifies any of the subject Plans as
23  self-funded and identifies the proper name of that entity if the Defendant does not
24  accept any responsibility to pay.

25       29.    At all relevant times, PHYSICIANS was advised by representatives and
26  agents of DEFENDANTS, that each of the Patients was insured, covered and eligible
27  for coverage under their respective Plans or Policies for the services to be rendered by
28  PHYSICIANS, at facilities operated by PHYSICIANS or where they worked; that

1    PHYSICIANS were authorized to render services, treatment and care; and that

2    PHYSICIANS would be paid by DEFENDANTS for performance of the services,

3    care and/or treatments rendered by PHYSICIANS, upon PHYSICIANS's submission

4    of claim forms and invoices to DEFENDANTS.

5         30.    At no time prior to the provision of services to each of the Patients by

6    PHYSICIANS, during conversations between PHYSICIANS or the facilities where

7    they worked and DEFENDANTS, did DEFENDANTS advise PHYSICIANS that

8    each of the Patients' policies or certificates of insurance was subject to certain

9    exclusions, limitations or qualifications, which might result in denial of coverage for

10   the procedures and treatments to be rendered to each of the Patients; nor were

11   PHYSICIANS offered copies of the applicable policies or certificates of insurance

12   coverage, or evidence of coverage documents applicable to each of the Patients by

13   DEFENDANTS; nor were PHYSICIANS otherwise or in any way made privy to the

14   terms, conditions, limitations, exclusions and qualifications of those policies or

15   certificates.  Although PHYSICIANS identified each of the Patients by name and

16   membership number and identified the type of treatment proposed for the Patients,

17   PHYSICIANS were never informed by DEFENDANTS of the specific amount that

18   PHYSICIANS would be paid; they were only told that PHYSICIANS would be paid,

19   reimbursed, remunerated, indemnified and/or compensated for the services which it

20   rendered to the Patients at the allowable rate paid by DEFENDANTS.

21        31.    At all relevant times prior to the rendition of treatment on the Patients,

22   PHYSICIANS were led to believe that it would be paid at Usual Customary and

23   Reasonable ("UCR") rates (less applicable deductibles and coinsurance amounts) for

24   the treatments it rendered to the Patients. In reliance upon the representations of

25   DEFENDANTS that DEFENDANTS would pay for the services to be rendered to

26   each Patient at UCR rates, PHYSICIANS were induced to and did provide and render

27   medical treatments and professional services to each of the Patients.   Had

28   DEFENDANTS advised PHYSICIANS that it would pay a reduced Medicare rate for

1    the same services, PHYSICIANS would never have rendered services to the Patients

2    or would have required, where allowable by law, each patient to self-pay for his or her

3    treatments.

4        32.    PHYSICIANS are a beneficiary (as that term is defined by 29 U.S.C. §

5    1002(8)) of the benefits payable under the subject Plans and insurance policies issued

6    to and covering the Patients, by virtue of the assignment of rights given by each of

7    the Patients to PHYSICIANS.  At all relevant times, PHYSICIANS were authorized

8    by law to act on behalf of the Patients with respect to filing claims with

9    DEFENDANTS, demanding production of documents from DEFENDANTS, filing

10   appeals on behalf of the Patients with DEFENDANTS and otherwise pursuing actions

11   on behalf of the Patients with respect to the Patients' Plans, in accordance with 29

12   C.F.R. 2560.503-1(b)(4).

13       33.    At all relevant times, during the conversations between PHYSICIANS

14   or the facilities where they worked and DEFENDANTS, PHYSICIANS were advised

15   by representatives of DEFENDANTS that DEFENDANTS consented to the provision

16   of treatments, services and/or supplies to be rendered by PHYSICIANS to each and

17   every one of the Patients; that PHYSICIANS would be paid certain unspecified and

18   undefined amounts for the services, treatments and/or supplies to be rendered to each

19   of the Patients, after PHYSICIANS had submitted claims for those services,

20   treatments and/or supplies and after DEFENDANTS had adjudicated, adjusted, and

21   or examined the claims; and that the specific amount of payment to be paid to

22   PHYSICIANS would be determined by DEFENDANTS.  Prior to the rendition of

23   services by PHYSICIANS, during the conversations between PHYSICIANS and

24   DEFENDANTS, DEFENDANTS requested that PHYSICIANS proceed to provide

25   services to each of the Patients, authorized PHYSICIANS to render services to each

26   and every Patient, assented to an agreement that PHYSICIANS render services to each

27   and every Patient, certified that each and every Patient was an insured, member,

28   subscriber or a covered member of DEFENDANTS and that each and every Patient

1    had existing coverage for the services to be rendered by PHYSICIANS which would

2    provide payment for the services to be rendered to each of the Patients by

3    PHYSICIANS.

4         34.    PHYSICIANS were not privy to, nor did it possess or have access to

5    the Evidence of Coverage documents, Summary Plan Descriptions, Plan Documents,

6    policies or Certificates of Insurance which are issued to the Patients.  As such,

7    PHYSICIANS did not have knowledge of or access to the definition of an "allowable

8    amount" or "allowable benefit" as that term is defined or used by DEFENDANTS, at

9    any time prior to the date that DEFENDANTS processes, adjusts and pays each claim.

10   These definitions were not imparted by DEFENDANTS to PHYSICIANS during the

11   insurance verification or authorization process, either, nor was PHYSICIANS

12   referred to any source or reference that would define, quantify or specify an

13   "allowable amount" for the proposed services or treatments or a methodology for

14   determining the rates to be paid by DEFENDANTS.

15        35.    At all relevant times, PHYSICIANS provided medically necessary and

16   appropriate medical care and treatment to Patients holding valid insurance policies

17   and certificates issued and/or administered by DEFENDANTS.

18        36.    At all relevant times, DEFENDANTS have improperly failed and

19   refused to pay or underpaid PHYSICIANS for medically necessary and appropriate

20   services rendered to DEFENDANTS's insureds, subscribers and members for those

21   treatments, services and/or supplies rendered by PHYSICIANS.  For each of the

22   Patient claims at issue in this action, PHYSICIANS provided medical services to

23   members and insureds of DEFENDANTS.

24        37.    Following the rendition of treatment by PHYSICIANS to its Patients,

25   invoices, bills and claims were submitted to DEFENDANTS for adjustment and

26   payment.  In compliance with the request of DEFENDANTS, medical records

27   pertaining to each of the Patients' treatments were provided to DEFENDANTS by

28   PHYSICIANS.  All requested information was supplied to DEFENDANTS by

1   PHYSICIANS.

2       38.    For each of the claims at issue in this case, DEFENDANTS failed and

3   refused to adjust the claims and to issue Explanation of Benefits Statements to

4   PHYSICIANS in a timely manner as required by Federal Regulations. These failures

5   constituted an effective denial of benefits, although an actual denial of benefits had

6   not been communicated by DEFENDANTS.  By virtue of its failure and refusal to

7   issue Explanation of Benefit Statements and to adjust the claims timely and/or at all,

8   PHYSICIANS were precluded from and inhibited from appealing the effective denial

9   of payment of the subject claims.

10      39.    For each of the claims at issue in this case, DEFENDANTS have failed

11  and refused to complete the claim examination process, have delayed issuing

12  Explanation of Benefit and Explanation of Payment statements to PHYSICIANS,

13  have requested unnecessary and irrelevant information and documentation from

14  PHYSICIANS which have no bearing on the claim examination process, have failed

15  and refused to provide notification of the reasons for its failure and refusal to pay

16  benefits and have failed to engage in a meaningful appeal process with PHYSICIANS.

17  For each of the claims at issue in this case, ultimately DEFENDANTS have failed and

18  refused to pay benefits in any amount whatsoever or underpaid, leaving the entire

19  charges unpaid and owed.

20      40.    For each of the claims at issue in this case, the "Explanation of Benefits

21  Statements" when they were ultimately issued and published by DEFENDANTS did

22  not explain how the claims were adjusted, disallowed or denied.  For each of the

23  claims at issue in this case, the "Explanation of Benefits Statements" provided a

24  vague, ambiguous and uncertain explanation for the manner by which

25  DEFENDANTS based its claim determination, making it impossible for

26  PHYSICIANS or the Patients to intelligently challenge the denials on appeal.

27  Defendant's Explanation of Benefit statements were uninformative, false, and

28  misleading, thereby depriving PHYSICIANS and the Patients from an ability to

1    intelligently engage in the appeal process or understand the basis and rationale for

2    DEFENDANTS's denials of benefits.

3        41.    At no time prior to rendering services to the Patients have

4    DEFENDANTS ever advised, explained, informed or otherwise described to

5    PHYSICIANS how DEFENDANTS determined to deny/underpay the claims and/or

6    disallow the claims, nor did it advise PHYSICIANS that it would apply a definition

7    of Maximum Allowable Amount that was different than the definition it had applied

8    to similar claims in the past.  PHYSICIANS are informed and believe and thereon

9    alleges that each of the subject Patient's claims was adjusted, considered, examined

10   and processed, simultaneously, uniformly and conjunctively as one large claim,

11   without distinction or discrimination by DEFENDANTS.  For each of the involved

12   Patients, each of their claims for services rendered by PHYSICIANS were uniformly

13   denied or underpaid on the same basis and with the same explanation.  Each claim

14   was denied or underpaid by DEFENDANTS in its Explanation of Benefits Statements

15   on the terse and uninformative grounds that:

16            Charge exceeds the allowed amount under the member's

17            plan for services rendered by this non-contracted provider.

18   This statement shed no light on the basis for the denial or underpayment.  This

19   statement referred to information in DEFENDANTS's file or Plan documents which

20   was not accessible to or available to PHYSICIANS and which provided no basis for

21   PHYSICIANS to appeal or otherwise challenge the denial.  Despite the fact that each

22   Patient received unique services and had unique circumstances surrounding their

23   treatments, each and every Explanation of Benefit Statement was denied and/or

24   underpaid for almost exactly the same reasons.  The same explanation quoted above

25   or wording similar to it, was given for DEFENDANTS's denial of each Patient's

26   claims.  None of the Explanation of Benefit Statements, indicated the language or

27   clause of the subject Plan which had been relied upon to deny benefits, nor was any

28   reference made to the subject Plan in denying benefits.

42.     In each one of the Explanation of Benefit Statements issued by DEFENDANTS in which a denial was communicated, DEFENDANTS failed to advise PHYSICIANS of the right of the Patient or PHYSICIANS to appeal the adverse claim determination made by DEFENDANTS, in violation of Federal law and regulations.  No statements were made by DEFENDANTS in any of these Explanation of Benefit Statements, concerning the right to appeal, file a grievance, seek reconsideration or otherwise engage in an administrative review process, as required by Federal law and regulations.

43.     DEFENDANTS have failed and refused to pay or have underpaid benefits for the services rendered by PHYSICIANS to the Patients in violation of the terms of the subject Plans, policies, Explanation of Coverage documents and other benefit plans, Summary Plan Descriptions and insurance agreements.

**FIRST COUNT:**

**FOR BREACH OF PLANS RELATING TO**

**COVERAGE, PURSUANT TO 29 U.S.C.**

**SECTION 29 U.S.C. CODE SECTION 1132(a)(1)(B)**

**[AS AGAINST ALL DEFENDANTS]**

44.     The allegations of all previous paragraphs are incorporated herein by reference as if set forth in full.

45.     Defendants delivered to PHYSICIANS's Patients various health insurance policies or other certificates of insurance, health plans, evidence of coverage documents, Summary Plan Descriptions and/or Plan Documents, in which they promised to provide coverage and benefits for health services and treatments.

46.     Under the terms of those policies, certificates of insurance, evidence of coverage documents, Plan documents and Summary Plan Descriptions, Defendants agreed to provide PHYSICIANS's Patients with coverage, benefits and reimbursement for health care services and treatments.  Under the terms of those

policies, certificates of insurance, evidence of coverage documents, Plan documents and Summary Plan Descriptions, Defendants agreed to provide the PHYSICIANS's Patients with coverage, benefits and reimbursement for those health care services and treatments rendered by PHYSICIANS, without exception, exclusion, qualification or limitation.

47.    At all relevant times, PHYSICIANS were a beneficiary and/or third party beneficiary of the subject policies, plans and contracts by which their Patients were insured or covered by Defendants, based upon the assignment of rights issued by each Patient to PHYSICIANS.  Alternatively, at all relevant times, PHYSICIANS were assigned the rights and remedies of its Patients to pursue claims and enforce the rights of the Patients under those plans and contracts by which its Patients were insured or covered by Defendants.  Each and every one of the Patients received health services and treatments from PHYSICIANS.  Shortly after those services were rendered, PHYSICIANS submitted claims on behalf of the Patients to Defendants for adjustment, payment, reimbursement and coverage.  For each of these claims and for each of the involved Patients, Defendants have failed and refused to pay, process or adjust these claims in an appropriate fashion by, among other acts and omissions:

(A)    Delaying the processing, adjustment and/or payment of claims for periods of time, greater than 45 days after submission of the claims, in violation of 29 C.F.R. § 2560.503-1(f)(2)(iii)(B);

(B)    Failing and refusing to provide any notice and/or explanation for the denial of benefits, payments or reimbursement of the claims of each of the Patients, in violation of 29 U.S.C. § 1133(1);

(C)    Failing and refusing to provide an adequate notice and/or explanation for the denial of benefits, payments or reimbursement of claims of each of the Patients, in violation of 29 U.S.C. § 1133(1);

(D)    Failing and refusing to provide an explanation for the denial of benefits, payments or reimbursements of claims of each of the Patients, and by

1    failing and refusing to set forth the specific reasons for such denials, all

2    in violation of 29 U.S.C. § 1133(1);

3    (E)    Failing and refusing to provide an explanation for the denial of benefits,

4    payments or reimbursements of claims of each of the Patients, written in

5    a manner calculated to be understood by the participant, in violation of

6    29 U.S.C. § 1133(1);

7    (F)    Failing to afford PHYSICIANS and/or its Patients with a reasonable

8    opportunity to engage in an appeal process, in violation of 29 U.S.C. §

9    1133(2);

10   (G)    Failing to afford PHYSICIANS and/or its Patients with a reasonable

11   opportunity to engage in an appeal process which was full and fair, in

12   violation of 29 U.S.C. § 1133(2);

13   (H)    Requiring PHYSICIANS and/or its Patients to file more than two appeals

14   of an adverse benefit determination prior to bringing a civil action, in

15   violation of 29 C.F.R. 2560.502-1(c)(2);

16   (I)    Failing and refusing to provide PHYSICIANS and/or its Patients with

17   information pertaining to their rights to appeal, including, but not limited

18   to those deadlines for filing appeals and/or the requirements that an

19   appeal be filed, in violation of 29 U.S.C. § 1133(1);

20   (J)    Violating the minimum requirements for employee benefit plans

21   pertaining to claims and benefits by participants and beneficiaries, in

22   violation of 29 C.F.R. § 2560.503-1(a), et seq.;

23   (K)    Failing and refusing to establish and maintain reasonable claims

24   procedures, in violation of 29 C.F.R. § 2560.503-1(b), et seq.;

25   (L)    Establishing, maintaining and enforcing claims procedures which unduly

26   inhibit the initiation and processing of claims for benefits, in violation of

27   29 C.F.R. § 2560.503-1(b)(3);

28   (M)    Requiring that the Patients pay a fee or cost as a condition to making a

1    claim or appealing an adverse claim or benefit determination, in violation
2    of 29 C.F.R. § 2560.503-1(b)(3);

3    (N)    Precluding and prohibiting PHYSICIANS from acting as an authorized
4           representative of the Patients in pursuing a benefit claim or appeal of an
5           adverse benefit determination, in violation of 29 C.F.R. § 2560.503-
6           1(b)(4);

7    (O)    Failing and refusing to design, administer and enforce their processes,
8           procedures and claims administration systems to ensure that benefit
9           claim determinations are made in accordance with the governing Plan
10          documents, in violation of 29 C.F.R. § 2560.503-1(b)(5);

11   (P)    Failing and refusing to design, administer and enforce their processes,
12          procedures and claims administration to ensure that their governing Plan
13          documents and Plan provisions have been applied consistently with
14          respect to similarly situated participants, beneficiaries and claimants, in
15          violation of 29 C.F.R. § 2560.503-1(b)(5);

16   (Q)    Failing and refusing to provide PHYSICIANS and/or its Patients with
17          reasonable access to and/or copies of documents, records and other
18          information relevant to the denial of benefits, in violation of 29 U.S.C.
19          §§ 1021, 1022 and 1132(c) and 29 C.F.R. § 2560.503-1(b)(3), thereby
20          justifying the imposition of penalties under 29 U.S.C. § 1132(c);

21   (R)    Failing and refusing to pay benefits for services rendered by
22          PHYSICIANS which DEFENDANTS had authorized, in violation of
23          California Health & Safety Code § 1371.8 and California Insurance Code
24          §796.04; and

25   (S)    Rescinding each and every authorization given to PHYSICIANS in
26          which PHYSICIANS's Patients' care, treatment and services were pre-
27          approved, authorized and certified by DEFENDANTS, in violation of
28          California Health & Safety Code § 1371.8 and California Insurance Code

1    §796.04.

2    48.    The failure and refusal of Defendants to provide appropriate coverage,

3    reimbursement, payment, and/or benefits for the health benefits rendered by

4    PHYSICIANS to PHYSICIANS's Patients who were covered by Defendants and

5    Defendants' denials and under payments of health insurance benefits and coverage

6    constitutes a breach of the insurance plans and/or employee benefit Plans between

7    Defendants and PHYSICIANS's Patients. PHYSICIANS seek reimbursement and

8    compensation for any and all payments which it would have received and to which it

9    will be entitled as a result of Defendants' failures to pay appropriate benefits and cover

10   those services rendered by PHYSICIANS to the Patients, in an amount presently

11   unknown but to be set forth at the time of trial.

12   49.    Defendants have arbitrarily and capriciously breached the obligations set

13   forth in the Plan issued by Defendants, and each of them.  Defendants, and each of

14   them, have arbitrarily and capriciously breached their obligations under the ERISA

15   Plan to provide PHYSICIANS and the Patients with health benefits.

16   50.    As a direct and proximate result of the aforementioned conduct of

17   Defendants in failing to provide PHYSICIANS and the Patients with health benefits,

18   PHYSICIANS have been damaged in an amount equal to the amount of benefits

19   PHYSICIANS should have received and to which the Patients would have been

20   entitled had Defendants paid the payments as required under the subject Plans.

21   51. The following terms appear in some or all of the plans: UCR is defined in

22   the Glossary as "Usual, Customary, and Reasonable (UCR) Rate: A Provider

23   charge is considered "Usual and Customary and Reasonable" if it is the amount

24   that most physicians in the area charge for this same service." Allowable

25   Amount is defined in the Glossary as "Allowable Amount: The maximum

26   amount a plan allows for a covered service. …  For Out-of-Network Providers

27   each medical network determines the Allowable Amount for the MPI Health

28   Plan. The Allowable Amount is always less than or equal to the Billed Charge.

1   Covered services are paid by the Plan at the rate of 50% of either the 70th
2   percentile of the UCR schedule or the Anthem Blue Cross/BlueCard fee
3   schedule. The $15 or $30 Co-Payment per visit still applies ($30 Co-Payment if
4   the Participant resides within the MPTF service area defined on page 67 but
5   chooses to not use one of the MPTF health centers or receive and use a TIHN
6   Provider). The patient is also responsible for any Balance Billing.

7   52.    In respect of the wording related to Emergency situations the wording is
8   as follows: "Out-of-Network: There is no limit on Out-of-Pocket costs if a patient uses
9   Out-of-Network physicians or hospitals, except in an emergency. In an emergency,
10  the Out-of-Pocket Maximum for the emergency room facility Allowable Amounts or
11  the hospital facility Allowable Amounts when admitted through the emergency room
12  is $1,000 per emergency. There is no Out-of-Pocket Maximum for Out-of-Network
13  professional charges, even in an emergency. 3. The $100 emergency room Co-Pay
14  will be waived if you are admitted to the hospital, but the $100 Co-Pay upon admission
15  to the hospital for an overnight stay will still apply. In addition, the Plan will pay 90%
16  of the Allowable facility Amount (In- or Out-of-Network). The maximum out-of-
17  pocket is $1,000 of the Allowable Amounts for the facility only. Out-of-Network
18  professional charges are payable at 50% of Allowable Amounts. If you are not
19  admitted to the hospital, services performed in the emergency room, whether a
20  contracted facility or not, will be paid at 90% of the Allowable Amount for covered
21  services, less the $100 Co-Pay."

22  53.    It is therefore entirely clear that by paying less than UCR rates and by
23  disallowing more than $1,000 the DEFENDANT is in Breach of their contract with
24  the Patients and through the Assignments with Physicians.

25  54.    As a direct and proximate result of the aforesaid conduct of Defendants
26  in failing to provide disability coverage as required, PHYSICIANS has suffered, and
27  will continue to suffer in the future, damages under the policy, plus interest and other
28  economic and consequential damages, for a total amount to be determined at the time

1  of trial.

2      55.    29 U.S.C. § 1132(g)(1) authorizes this court to award reasonable

3  attorneys' fees and costs of action to PHYSICIANS.  As a result of the actions and

4  failings of the Defendants, and each of them, PHYSICIANS have retained the services

5  of legal counsel and has necessarily incurred attorneys' fees and costs in prosecuting

6  this action.  Further, PHYSICIANS anticipate incurring additional attorneys' fees and

7  costs in hereafter pursuing this action, all in a final amount which is currently

8  unknown. PHYSICIANS therefore request an award of reasonable attorneys' fees and

9  costs.

10  / / /

11  / / /

12  / / /

13  / / /

14  / / /

15  / / /

16  / / /

17  / / /

18  / / /

19  / / /

20  / / /

21  / / /

22  / / /

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

# PRAYER FOR RELIEF

WHEREFORE, Plaintiffs AOC, JSE, JS pray for judgment as follows:

## ON THE FIRST COUNT:

1.   For benefits payable by DEFENDANTS under the subject employee benefit plans to reimburse PHYSICIANS for those services rendered to the Patients by PHYSICIANS;

2.   For reasonable attorneys' fees and costs;

3.   For prejudgment interest at a rate of 10% per annum as mandated by California Insurance and Health & Safety Codes; and

3.   For such other relief as the court deems appropriate.

DATED:  July 24, 2018                    Respectfully submitted,

By:   /S/ Alan Nesbit

ALAN NESBIT

Attorney for Plaintiffs

ADVANCED ORTHOPEDIC CENTER, INC. JEFFREY M SMITH MD INC. and JSE EMERGENCY MEDICAL GROUP INC.

1
2
3
4

## **DEMAND FOR JURY TRIAL**

5        Plaintiffs AOC, JSE, JS hereby demand a jury trial as provided by law.

6
7    DATED:  July 24, 2018                                Respectfully submitted,

8
9
10                                               By:   /S/ Alan Nesbit

11                                                       ALAN NESBIT

12                                               Attorney for Plaintiff
                                                 ADVANCED ORTHOPEDIC
13                                               CENTER, INC. JEFFREY M SMITH
                                                 MD INC. and JSE EMERGENCY
14                                               MEDICAL GROUP INC.

15
16
17
18
19
20
21
22
23
24
25
26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28